7078

## JOHNSON v. WESTERN UNION TEL. CO.

1. EVIDENCE.—It is not reversible error to admit evidence over objection as to a point on which evidence had already been admitted without objection.

2. TELEGRAPH COMPANIES.—NEGLIGENCE may be presumed from delay in transmission and delivery of a telegram.

3. NEW TRIAL.—Order granting new trial *nisi* should not contain such provisions as would deprive the moving party of his right of appeal before it becomes effective.

4. TELEGRAPH COMPANIES—PUNITIVE DAMAGES—OFFICE HOURS.—Evidence tending to show the address of a telegram had been changed during transmission, efforts made to deliver in changed condition, efforts made to correct error, failure to deliver for about sixteen hours, twelve of which were non-office hours, *held* not sufficient to send issue of punitive damages to jury.

Before HYDRICK, J., Greenville, July term, 1907. Reversed.

Action by W. H. Johnson against Western Union Telegraph Company. From judgment for plaintiff, defendant appeals.

*Messrs. George H. Fearons, John Gary Evans* and *Joseph A. McCullough,* for appellant, cite: *Evidence as to condition of plaintiff's sister should not have been admitted, because the company had no notice of it:* 73 S. C., 218; 75 S. C., 182, 208, 520; 76 S. C., 301. *New trial nisi upon conditions erroneous:* Code 1902, sec. 2734; 57 S. C., 395.

*Messrs. J. P. Carey* and *Haynsworth, Patterson & Blythe,* contra, cite: *Evidence as to condition of plaintiff's sister was admissible under the allegation of wantonness:* 54 S. C., 498; 65 S. C., 97, 570, 506. *There was evidence here tending to show wilfulness:* 75 S. C., 134; 64 S. C., 514; 65 S. C., 122. *Upon proof of wilfulness both actual*

*and punitive damages may be awarded:* Code of Proc., 186a; 66 S. C., 544. *Act of defendant was proximate cause of delay in delivering message, and it is liable:* 75 S. C., 126; 70 S. C., 423. *Order granting new trial nisi is in proper form:* 4 Rich. L., 1.

December 5, 1908. The opinion of the Court was delivered by

, MR. JUSTICE GARY. This is an action for damages, alleged to have been sustained by the plaintiff through the negligence, wilfulness and wantonness of the defendant in failing to deliver a telegram.

On the 3d of October, 1904, at 4:05 p. m., the following message was filed with the agent of the defendant at Lancaster, S. C.:

"To W. H. Johnson, Pickens, S. C.: Come at once. Outrage committed upon sister. Joseph Johnson. Dictated by W. I. Williams."

The jury rendered a verdict in favor of the plaintiff for $929.

In disposing of a motion for a new trial his Honor, the presiding Judge, concluded his order as follows: "That if the defendant do tender to the plaintiff's attorneys the sum of six hundred dollars, within thirty days after the service upon plaintiff's attorneys of notice of this order, and if the same be accepted, it shall be in full satisfaction of the verdict, and the plaintiff shall thereafter have leave to enter judgment against defendant only for the costs and disbursements of the action; but if the said tender be refused, the verdict herein shall be set aside and a new trial had; and if the defendant fail to make the tender, as aforesaid, then the plaintiff shall have leave to enter up judgment against the defendant for the full amount found by the jury, and for the costs and disbursements of the action."

The defendant appealed upon numerous exceptions, which it will not be necessary to consider in detail.

The first question presented by the exceptions is whether there was error on the part of the Circuit Judge in allowing the plaintiff to testify that his sister was pregnant at the time the message was sent.   While it is true the defendant objected to the introduction of certain testimony to that effect, nevertheless similar testimony was admitted without objection.   The exceptions, therefore, raising this question must be overruled.

The next question that will be considered is whether there was any testimony tending to sustain the allegation of negligence on the part of the defendant.   We deem it only necessary to cite the case of *Poulnot* v. *Tel. Co.,* 69 S. C., 545, 48 S. E., 622, to show that the exceptions raising this question cannot be sustained.

The exceptions assigning error, in the order of the Circuit Judge refusing the new trial, are disposed of by the cases of *Hall* v. *R. R. Co.,* 81 S. C., 522, and *Jackson* v. *Southern Cotton Oil Co.,* 81 S. C., 564.

We next come to the consideration of the question whether there was any testimony tending to sustain the allegations of wilfulness and wantonness.

The message was forwarded to Charlotte, was relayed at Atlanta, and transmitted to Easley, which is about eight miles from Pickens, to which point all messages are sent by telephone.   When the message was delivered to the agent at Lancaster, the defendant collected 50 cents —25 cents being for its regular charge for transmitting it to Easley, and 25 cents for sending by telephone to Pickens.   The telegram was received at Easley at 5:33 p. m. on the 3d of October.   When the message was received at Easley, the name of the addressee had been changed from "W. H. Johnson" to "M. Johnson."   The testimony does not explain how the change was made. The message was promptly transmitted by telephone to

Pickens, and received by the operator at that place, at 5:35 p. m. of the same day.

On cross-examination Miss Gleassaner, the telephone operator at Easley, testified as follows: "Q. Miss Finney was the girl at the other end of the line at Pickens? A. Yes, sir. Q. After she told you there was no such person at M. Johnson at Pickens, you reported that to the Western Union Telegraph Company? A. Yes, sir. Q. And you asked Mr. Higgins, the operator, if he was sure it was M. Johnson? A. Yes, sir. Q. And he said he was? A. Yes, sir. Q. And Mr. Higgins suggested that you try the Machine Johnson, who turned out to be W. H. Johnson? A. Yes, sir. Q. And you told Miss Finney what Mr. Higgins, the Western Union operator, said? A. Yes, sir. Q. And Miss Finney told you that was W. H. Johnson? A. Yes, sir. Q. And you delivered that message to her? A. Yes, sir. Q. And that was immediately after you had 'phoned the original message? A. Yes, sir."

Miss Finney, the telephone operator at Pickens, testified as follows: "Q. Did you receive this message (presenting same)? A. Yes, sir. Q. Over the telephone lines? A. Yes, sir. Q. At what time did you receive it? A. At 5:35 in the afternoon. Q. When you received that message, what did you do? A. I 'phoned over town searching for M. Johnson. I 'phoned to all of the stores and to the hotel, and I couldn't find him. Q. Could you find the party? A. No, sir. Q. What did you do then? A. I 'phoned to Mr. Higgins that I couldn't find him. Q. What did he say? A. He said 'why don't you try Machine Johnson,' and I said 'his initials are W. H. Johnson,' and he said he would try to get another report on the message. Q. Did he get another report? A. I don't know, sir. Q. Did he tell you he would get another report? A. Yes, sir. Q. When? A. Between then and closing time, at seven o'clock then. Q. Did you hear from him any more then? A. No, sir. Q. Did you make any further

effort to deliver the telegram? A. No, sir. I waited for another report, and the next morning they called me up, and said, Mr. Higgins said deliver the message to W. H. Johnson at once, and I sent it out at once."

She testified on cross-examination as follows: "Q. Mr. Higgins told her to tell you to try Machine Johnson? A. He told me that. · Q. Didn't both of them tell you? A. Yes, sir. Q. Both of them told you to try Machine Johnson? A. Yes, sir. Q. Did you try him? A. No, sir. I knew his initials were W. H., and I was looking for M. Johnson. Q. When both of them requested you to try Machine Johnson, why didn't you try him? A. Because the message was to M. Johnson, and I knew he was W. H. Johnson, and I didn't have any idea he was the man. Q. You made no effort to deliver it to W. H. Johnson? A. No, sir; I was waiting for another report, and I' was looking for M. Johnson. Q. The next morning, you say Mr. Higgins told you, you had better deliver it to W. H. Johnson? A. Yes, sir."

T. B. Higgins, the telegraph operator at Easley, testified as follows: "Q. Do you remember the circumstances connected with the receipt of this message in question? A. Yes, sir. The message was received by an operator named Stokes, and was carried to the telephone office by him. I was in the office, and the first I knew there was any question about the telegram, I suppose it was fifteen or twenty minutes or possibly a half of an hour, I was called to the telephone, and the girl at Pickens wanted to know if M. Johnson was the right address, and I told her that our copy read M. Johnson, and she said there was no M. Johnson in Pickens; that there was a W. H. Johnson there, and I asked her if W. H. Johnson was the machine man. I had met him, and she said it was, and I told her to try him and see if he knew anything about it, or would claim the message. I knew the nature of the message, and I told her, in the meantime, I would take it up with our people. Q. At

what hour was that? A. It was somewhere about 5:50. Q. What time did the telephone office close at Easley. A. At seven o'clock. Q. Did you take it up with your people? A. Yes, sir; I called Atlanta office, and they had to get a certain number. We have all of the messages numbered, one, two, and three, and so on, as they come. Q. Which way did that message come? A. It came by Atlanta, relayed in Atlanta. Q. And you tried the Atlanta office how often? A. About three times, at intervals of about twenty minutes. Messages in a large office like that, they have such large files of messages they have transmitted, filed away for future reference, and he said he would get the message and have it repeated to me. Q. Did you get any reply from it? A. No, sir, not up to seven o'clock, and I asked the telephone people at Pickens to stay open if they possibly could, until I could hear from it, if Machine Johnson didn't know anything about it. I knew the nature of the message, and, of course, for the sake of human feeling, if nothing else, I wanted the right party to get the message. She went off at seven o'clock and said she would not stay open any longer, and I asked her at that time if she had tried W. H. Johnson, and she said she had not, that he had no 'phone, and I asked her if he lived within the delivery limits. The customary free delivery limits for a town like Pickens is half of a mile, and she told me she had not, and that it was not addressed to W. H. Johnson, and I told her I knew that, but it would be no harm to try him, and see if he knew anything about the party. I went off at seven o'clock, and when I came back the next morning, the operator in Atlanta had corrected the message. Q. What time was the message corrected? A. I dont' know what time in the night it was. I was not there."

It is not contended that the office hours from 7 a. m. to 7 p. m. were unreasonable. Therefore, in computing the time of the delay, the hours from 7 p. m., when the

office closed to 7 a. m. when it was opened, is not to be considered.

We are unable to find any testimony tending to show that the plaintiff was entitled to punitive damages.

The case under consideration is quite different from those of *Lathan* v. *Tel. Co.*, 75 S. C., 129, 55 S. E., 134, and *Walker* v. *Tel. Co.*, 75 S. C., 512, 56 S. E., 38, as the mistake herein might more reasonably be attributed to mere inadvertence, and prompt and strenuous efforts were also made to correct the mistake as soon as it was discovered.

It is the judgment of this Court that the judgment of the Circuit Court be reversed and the case remanded for a new trial.